STRANGE & CARPENTER
Brain R. Strange (Cal. Bar. No. 103252)
LACounsel@earthlink.net
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210

LAW OFFICE OF JOSEPH MALLEY
Joseph H. Malley (*pro hac vice* pending)
malleylaw@gmail.com
1045 North Zang Blvd
Dallas, TX 75208
Telephone: (214) 943-6100

Attorneys for Plaintiffs

E-filing

Filed
DEC – 6 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

ADR

Paid
$1
99

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

By fax

| | |
|---|---|
| ISRAEL OLIVARES; CLARISSA PORTALES; individuals, on behalf of themselves and others similarly situated, | CASE No. CV11-06151 HRL |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| v. | CLASS ACTION COMPLAINT FOR VIOLATIONS OF: |
| CARRIER IQ, INC., a Delaware Corporation; HTC AMERICA, INC., a Washington corporation; | 1. ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §2510; |
| | 2. STORED COMMUNICATIONS ACT, 18 U.S.C. §2701; |
| Defendant. | 3. CONSUMER LEGAL REMEDIES ACT, ("CLRA") CALIFORNIA CIVIL CODE § 1750; |
| | 4. UNFAIR COMPETITION LAW, CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200; |
| | 5. CALIFORNIA'S COMPUTER CRIME LAW, PENAL CODE §502; |
| | 6. CALIFORNIA INVASION OF PRIVACY ACT, PENAL CODE §630; |
| | 7. SONG-BEVERLY WARRANTY ACT, CALIFORNIA CIVIL CODE § 1792 |
| | 8. TEXAS DECEPTIVE TRADE PRACTICES ACT, TEXAS |

BUSINESS AND COMMERCE CODE
§ 17.41
9. BREACH OF EXPRESS WARRANTY
10. BREACH OF IMPLIED WARRANTY
11. NEGLIGENCE
12. TRESPASS TO PERSONAL
    PROPERTY/ CHATTELS
13. CONVERSION
14. UNJUST ENRICHMENT

1.      Plaintiffs, Israel Olivares, and Clarissa Portales, (collectively, "Plaintiffs"), by and through their attorneys Strange & Carpenter, and Law Office of Joseph H. Malley, P.C., bring this action on behalf of themselves and all others similarly situated, against Carrier IQ, Inc. ("Carrier IQ") and HTC, America, Inc. ("HTC"), (collectively with Carrier IQ, "Defendants"). Plaintiffs' allegations as to themselves and their own actions, as set forth herein, are based upon their information and belief and personal knowledge. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d) as set forth below.

## I.    NATURE OF THE ACTION

2.      Plaintiffs bring this consumer Class Action lawsuit pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) on behalf of themselves and a proposed class of similarly situated consumers ("Class Members") who purchased an HTC mobile device on which Carrier IQ's software, "HTC IQAgent," was installed, without notice or consent of Plaintiffs. This HTC IQAgent software was designed by Carrier IQ and customized by HTC in order to log and collect confidential, unencrypted user data including but not limited to (1) the contents of incoming text messages; (2) the URLs of websites visited by the user; and (3) the user's GPS coordinates; among other private and personally-identifying data. HTC IQAgent records this confidential data on a user's mobile device in an unencrypted format so that *any* device software or applications with log file permission can access and review it. Carrier IQ and HTC also have access to this confidential data and can transmit the data from a user's mobile device to remote servers at any time via hidden "text requests" sent to a user's mobile device by Carrier IQ, HTC or other authorized third parties. HTC IQAgent logs the hidden text

1   requests and the confidential data silently so that a user has no idea that data is being collected

2   and transmitted. HTC IQAgent is preinstalled on HTC's mobile devices so that data logging

3   begins the moment a user purchases and turns on the device, without notice to or consent from

4   the user. Because the software is preinstalled by HTC and runs as part of the device operating

5   system, data is automatically collected and can be transmitted via wireless internet or other

6   means, even if the device user has no carrier contract and the mobile device is not connected to

7   a mobile network. Finally, HTC IQAgent runs continuously and depletes resources on the

8   mobile device without notice to or authorization of the user, even when the mobile device is

9   not being used. The resources depleted by HTC IQAgent without notice or authorization

10   include (1) battery power; (2) device memory; (3) CPU; (4) bandwidth; and (5) text messages.

11   A user cannot stop the HTC IQAgent software from running under any circumstances, and a

12   user is unable to remove HTC IQAgent from the device without voiding the manufacturer's

13   warranty.

14         3.      Because of Defendants' actions, Plaintiffs and Class Members are victims of

15   unfair, deceptive, and unlawful business practices; wherein their privacy, financial interests,

16   and security rights, were violated by Carrier IQ and HTC. Plaintiffs and Class Members were

17   financially harmed by the Defendants when they purchased the HTC mobile devices with HTC

18   IQAgent, and Plaintiffs would not have purchased those devices if they had known that

19   Defendants' software could access, collect, transmit, analyze, store, and provide their

20

21   confidential unencrypted data to *any* device software or applications with log file permission

22   without Plaintiffs' knowledge of permission. Plaintiffs and Class Members were also harmed

23   by HTC and Carrier IQ's unauthorized use of their mobile device battery power, device

24   memory, CPU, bandwidth and text messages.

25         4.      HTC manufactured and sold to Plaintiffs and Class Members without notice, a

26   defective product that included HTC IQAgent, specially customized by HTC for use on its

27   mobile device. HTC acted individually, and in concert with, Carrier IQ to gain unauthorized

28   access to, log, collect, and transmit Plaintiffs' and Class Members' confidential, unencrypted

  data and to provide third-party access to this data. HTC IQAgent is a native HTC application

1    that was installed on HTC mobile devices with the knowledge of HTC.

2       5.      Carrier IQ acted independently, and in concert with HTC, knowingly

3    authorizing, directing, ratifying, acquiescing in, or participating in the conduct alleged herein.

4       6.      Carrier IQ individually, and in concert with HTC has been systematically

5    engaged in and facilitated a covert operation of logging and tracking Plaintiffs' and Class

6    Members' confidential, unencrypted user data and utilizing Plaintiffs' and Class Members'

7    mobile device resources, violating one or more of the following:

8              (a)     ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C.

9    §2510;

10             (b)     STORED COMMUNICATIONS ACT, 18 U.S.C. §2701;

11             (c)     CONSUMER LEGAL REMEDIES ACT, ("CLRA") CALIFORNIA

12   CIVIL CODE § 1750;

13             (d)     UNFAIR COMPETITION LAW, CALIFORNIA BUSINESS AND

14   PROFESSIONS CODE §17200;

15             (e)     CALIFORNIA'S COMPUTER CRIME LAW, PENAL CODE §502;

16             (f)     CALIFORNIA INVASION OF PRIVACY ACT, PENAL CODE

17   §630;

18             (g)     SONG-BEVERLY WARRANTY ACT, CALIFORNIA CIVIL CODE

19   § 1792

20             (h)     TEXAS    DECEPTIVE   TRADE   PRACTICES   ACT,   TEXAS

21   BUSINESS AND COMMERCE CODE § 17.41

22             (i)     BREACH OF EXPRESS WARRANTY

23             (j)     BREACH OF IMPLIED WARRANTY

24             (k)     NEGLIGENCE

25             (l)     TRESPASS TO PERSONAL PROPERTY/ CHATTELS

26             (m)     CONVERSION

27             (n)     UNJUST ENRICHMENT

28   **II.    JURISDICTION AND VENUE**

CLASS ACTION COMPLAINT
-4-

7. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants; there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

8. Venue is proper in this District under 28 U.S.C. §1391(b) and (c) against Defendants. A substantial portion of the events, conduct and omissions giving rise to the violations of law complained of herein occurred in this District. Carrier IQ's principal executive offices and headquarters are located in this District at 1200 Villa Street, Suite 200, Mountain View, CA 94041.

9. This Court has personal jurisdiction over the Defendants because Carrier IQ maintains its corporate headquarters in, and the events, conduct and omissions giving rise to the violations of law complained herein occurred in California. HTC conducts business in California and engaged in the acts alleged herein in California.

10. This Court also has subject matter jurisdiction over all causes of action and the Defendants implicated therein pursuant to 28 U.S.C. §1332(d), and because this action arises in part under a federal statute and this Court has jurisdiction pursuant to 18 U.S.C. §2710(c) which confers jurisdiction in the United States District Court for actions related to the Electronic Communications Privacy Act 18 U.S.C. §2510 and the Stored Communications Act, 18 U.S.C. §2701.

11. **INTRADISTRICT ASSIGNMENT**: Pursuant to Civil Local Rule 3-2(e), this case shall be assigned to the San Jose Division as it arises from Santa Clara County where Defendant Carrier IQ is headquartered and where the actions alleged as the basis of this claim took place.

## III. PARTIES

12. Plaintiff Israel Olivares ("Olivares") is a citizen and resident of California, (San Diego County, California). On information and belief, Olivares incorporates all allegations within this complaint. Olivares is a representative of the class ("Class"), as defined within the Class Allegations. In or around February 2011, Olivares purchased an HTC EVO 4G mobile

1   device that was preinstalled with HTC IQAgent, and used such mobile device on one or more

2   occasions during the class period in California.

3       13.     Olivares was not aware that HTC IQAgent was installed on his HTC device,

4   and was not aware that every time he used his HTC device, HTC IQAgent was logging and

5   collecting his confidential incoming text messages; the URLs of websites he visited; and his

6   actual GPS coordinates; among other private and personally-identifying data. He also was not

7   aware that HTC IQAgent made this confidential, unencrypted data available on Olivares's

8   mobile device log so that *any* device software or applications with log file permission could

9   access it. Finally, Olivares was not aware that HTC IQAgent depleted his mobile device

10  battery power, device memory, CPU, bandwidth and text messages, even while he was not

11  using his device. The HTC IQAgent software does not show up under the application launch

12  list on Olivares's device.

13      14.     Plaintiff Clarissa Portales ("Portales") is a citizen and resident of Dallas, Texas,

14  (Dallas County, Texas). On information and belief, Portales incorporates all allegations within

15  this complaint. Portales is a representative of the Class, as defined within the Class Allegations.

16  On January 2011, Portales purchased a an HTC EVO 4G mobile device that was preinstalled

17  with HTC IQAgent, and used such mobile device on one or more occasions during the class

18  period in Texas.

19

20      15.     Portales was not aware that HTC IQAgent was installed on her HTC device, and

21  was not aware that every time she used her HTC device, HTC IQAgent was logging and

22  collecting her confidential incoming text messages; the URLs of websites she visited; and her

23  actual GPS coordinates; among other private and personally-identifying data. She also was not

24  aware that HTC IQAgent made this confidential, unencrypted data available on Portales's

25  mobile device log so that *any* device software or applications with log file permission could

26  access it. Finally, Portales was not aware that HTC IQAgent depleted her mobile device battery

27  power, device memory, CPU, bandwidth and text messages, even while she was not using her

28  device. The HTC IQAgent software does not show up under the application launch list on

Portales's device.

16.     Carrier IQ is a Delaware corporation that maintains and has maintained at all relevant times its headquarters at 1200 Villa Street, Suite 200, Mountain View, CA, 94041 (Santa Clara County, California). Carrier IQ does business throughout the United States, and in particular, does business in the State of California and in this County.

17.     HTC is a Washington corporation that maintains and has maintained at all relevant times its headquarters at 13920 SE Eastgate Way, Bellevue, Washington 98005. HTC does business throughout the United States, and in particular, does business in the State of California and in this County.

## IV.   PLAINTIFFS' EXPERIENCE

18.     At all relevant times herein, Plaintiffs were and are residents of California and Texas.  During the class period, Plaintiffs owned and operated one or more HTC mobile devices installed with HTC IQAgent without Plaintiffs' knowledge.

19.     On one or more occasions during the class period, Plaintiffs accessed and used their HTC mobile devices to receive text messages and visit websites in their cities of residence and elsewhere.

20.     During the relevant class period, the HTC IQAgent software was "hidden" and did not appear on application launch menu on Plaintiffs' HTC mobile devices. During the relevant class period, Plaintiffs were unaware that HTC IQAgent populated and logged incoming text messages, visited URLs and GPS location data on their device log files. Plaintiffs were also unaware that this confidential data was available, unencrypted, to all software and programs with log file permission running on their devices. Additionally, they were unaware that HTC IQAgent had the mechanisms to, and did, transmit user data from Plaintiffs' devices to remote servers via periodic scheduling, WAP push requests, and text requests.

21.     During the relevant class period, HTC IQAgent, customized in part by HTC, was "hidden" and did not appear on the launch list of applications and software installed on Plaintiffs' HTC mobile devices.

22.     In or around November 2011, Plaintiffs became aware of information related to

the tracking activities of Carrier IQ and HTC. Plaintiffs downloaded a "log collector"

application to determine whether their mobile device possessed the Carrier IQ software. The

log collector is an application that collects a device log identifying software and applications

are running on a mobile device. Plaintiffs then accessed their HTC mobile device and engaged

in basic user activity such as doing websearches, accessing their Facebook accounts, updating

their Facebook "status," calling friends, sending text messages, and downloading applications.

23.     Olivares's log revealed the data collection and transmission actions of Carrier

IQ within his HTC mobile device which existed without notice or authorization, (highlighting

added):

```
11-21 13:10:03.692 V/AgentService_J( 237):
Action[1026]:com.htc.android.iqagent.action.ui08
11-21 13:10:10.168 V/AgentService_J( 237):
Action[1027]:com.htc.android.iqagent.action.ui19
11-21 13:10:10.358 V/AgentService_J( 237):
Action[1028]:com.htc.android.iqagent.action.ui19
11-21 13:10:15.463 V/AgentService_J( 237):
Action[1029]:com.htc.android.iqagent.action.ui19
11-21 13:10:16.304 V/AgentService_J( 237):
Action[1030]:com.htc.android.iqagent.action.ui19
11-21 13:10:18.566 V/AgentService_J( 237):
Action[1031]:com.htc.android.iqagent.action.ui19
11-21 13:10:18.596 V/AgentService_J( 237):
Action[1032]:com.htc.android.iqagent.action.ui19
11-21 13:10:19.397 V/AgentService_J( 237):
Action[1033]:com.htc.android.iqagent.action.ui08
11-21 13:10:28.336 V/AgentService_J( 237):
Action[1034]:com.htc.android.iqagent.action.ui08
11-21 13:10:30.628 V/AgentService_J( 237):
Action[1035]:com.htc.android.iqagent.action.ui08
11-21 13:10:32.820 V/AgentService_J( 237):
Action[1036]:com.htc.android.iqagent.action.ui08
11-21 13:10:35.062 V/AgentService_J( 237):
Action[1037]:com.htc.android.iqagent.action.ui08
11-21 13:10:35.072 V/AgentService_J( 237):
Action[1038]:com.htc.android.iqagent.action.ui08
11-21 13:10:44.011 V/AgentService_J( 237):
Action[1039]:com.htc.android.iqagent.action.ui08
11-21 13:10:46.263 V/AgentService_J( 237):
Action[1040]:com.htc.android.iqagent.action.ui08
11-21 13:10:48.505 V/AgentService_J( 237):
Action[1041]:com.htc.android.iqagent.action.ui08
11-21 13:10:50.737 V/AgentService_J( 237):
```

Action[1042]:com.htc.android.iqagent.action.ui08
11-21 13:10:52.960 V/AgentService_J( 237):
Action[1043]:com.htc.android.iqagent.action.ui15
11-21 13:10:52.970 V/AgentService_J( 237):
Action[1044]:com.htc.android.iqagent.action.ui08
11-21 13:10:53.060 V/AgentService_J( 237):
Action[1045]:com.htc.android.iqagent.action.ui15
11-21 13:10:58.415 V/AgentService_J( 237):
Action[1046]:com.htc.android.iqagent.action.ui08
11-21 13:10:59.616 V/AgentService_J( 237):
Action[1047]:com.htc.android.iqagent.action.ui08
11-21 13:11:04.211 V/AgentService_J( 237):
Action[1048]:com.htc.android.iqagent.action.ui08
11-21 13:11:12.959 V/AgentService_J( 237):
Action[1049]:com.htc.android.iqagent.action.ui13
11-21 13:11:13.480 V/AgentService_J( 237):
Action[1050]:com.htc.android.iqagent.action.ui13
11-21 13:11:21.547 V/AgentService_J( 237):
Action[1051]:com.htc.android.iqagent.action.ui19
11-21 13:11:21.598 V/AgentService_J( 237):
Action[1052]:com.htc.android.iqagent.action.ui13
11-21 13:11:22.278 V/AgentService_J( 237):
Action[1053]:com.htc.android.iqagent.action.ui08
11-21 13:11:22.288 V/AgentService_J( 237):
Action[1054]:com.htc.android.iqagent.action.ui19
11-21 13:11:22.829 V/AgentService_J( 237):
Action[1055]:com.htc.android.iqagent.action.ui15
11-21 3:11:24.340 V/AgentService_J( 237):
    Action[1056]:com.htc.android.iqagent.action.ui08

24.    Portales's log revealed the data collection and transmission actions of Carrier IQ within her HTC mobile device which existed without notice or authorization, (highlighting added):

11-21 12:03:47.039 V/AgentService_J(16252):
Action[441]:com.htc.android.iqagent.action.ui15
11-21 12:03:47.069 V/AgentService_J(16252):
Action[442]:com.htc.android.iqagent.action.ui02
11-21 12:03:47.079 V/AgentService_J(16252):
Action[443]:com.htc.android.iqagent.action.ui15
11-21 12:03:47.079 V/AgentService_J(16252):
Action[444]:com.htc.android.iqagent.action.ui15
11-21 12:03:47.079 V/AgentService_J(16252):
Action[445]:com.htc.android.iqagent.action.ui15
11-21 12:03:47.079 V/AgentService_J(16252):
Action[446]:com.htc.android.iqagent.action.ui19
11-21 12:03:47.220 V/AgentService_J(16252):

1  Action[447]:com.htc.android.iqagent.action.ui08
   11-21 12:03:49.222 V/AgentService_J(16252):
2  Action[448]:com.htc.android.iqagent.action.ui08
   11-21 12:03:50.032 V/AgentService_J(16252):
3  Action[449]:com.htc.android.iqagent.action.ui13
   11-21 12:03:50.243 V/AgentService_J(16252):
4  Action[450]:com.htc.android.iqagent.action.ui15
5  11-21 12:03:50.993 V/AgentService_J(16252):
   Action[451]:com.htc.android.iqagent.action.ui19
6  11-21 12:03:51.424 V/AgentService_J(16252):
7  Action[452]:com.htc.android.iqagent.action.ui19
   11-21 12:03:51.454 V/AgentService_J(16252):
8  Action[453]:com.htc.android.iqagent.action.ui08
9  11-21 12:03:53.706 V/AgentService_J(16252):
   Action[454]:com.htc.android.iqagent.action.ui08
10 11-21 12:03:55.948 V/AgentService_J(16252):
   Action[455]:com.htc.android.iqagent.action.ui08
11 11-21 12:04:02.665 V/AgentService_J(16252):
12 Action[456]:com.htc.android.iqagent.action.ui08
   11-21 12:04:06.418 V/AgentService_J(16252):
13 Action[457]:com.htc.android.iqagent.action.ui19
14 11-21 12:04:06.428 V/AgentService_J(16252):
   Action[458]:com.htc.android.iqagent.action.ui13
15 11-21 12:04:06.488 V/AgentService_J(16252):
16 Action[459]:com.htc.android.iqagent.action.ui15
   11-21 12:04:06.659 V/AgentService_J(16252):
17 Action[460]:com.htc.android.iqagent.action.ui19
   11-21  2:04:09.401 V/AgentService_J(16252):
18 Action[461]:com.htc.android.iqagent.action.ui08

19
20      25.     Plaintiffs consider information about their received text messages, visited

21 websites and GPS location to be in the nature of confidential and personal information that

22 they protect from disclosure, including by controlling their mobile device's privacy settings for

23 acceptance or rejection. Plaintiffs were not made aware by Defendants of the existence of HTC

24 IQAgent on their mobile devices or the logging, collection and transmission of their mobile

25 device data.

26      26.     Plaintiffs also consider their device battery power, device memory, CPU,

27 bandwidth and text messages to be valuable personal property that they protect from

28 unauthorized use by third parties, including by controlling what software and applications have

access to those resources. Plaintiffs were not made aware by Defendants of the existence of

1     HTC IQAgent on their mobile devices or the depletion of their device battery power, device

2     memory, CPU, bandwidth and text messages by that software.

3          27.      It is Plaintiffs' belief that The Carrier IQ software, customized in part by HTC,

4     was logging, collection and transmission of confidential user data on their mobile devices

5     permitted one or more objects within their mobile devices to be used for tracking and analysis

6     by Defendants and/or third parties, thus their mobile device data was obtained in an effort to

7     monitor and profile their mobile device activities. Plaintiffs did not receive notice of the

8     installation of a tracking identifier, did not consent to its installation, and did not want a

9     tracking identifier to be installed on their mobile device. Moreover, Plaintiffs did not authorize

10     Defendants to log, collect, transmit, or store their confidential mobile device data without

11     notice or express consent. Such software was running on Plaintiffs mobile device and

12     collecting and transmitting Plaintiffs data without notice or authorization, utilizing Plaintiffs

13     battery power, device memory, CPU, bandwidth and limited text messages without notice or

14     authorization, even when Plaintiffs stopped actively using the device.

15          28.      In selecting the HTC mobile device over the service and goods of other

16     competing mobile device manufacturers, Plaintiffs reasonably expected that their confidential

17     user data would not be accessed, logged and transmitted to third parties without their

18     knowledge and consent. They also reasonably expected that their mobile device resources

19     would not be depleted without their knowledge or control.

20

21          29.      Had Plaintiffs known that the HTC devices they purchased would include

22     software that provided third party access to their confidential user data and their mobile device

23     resources without notice to or authorization by Plaintiffs, Plaintiffs would have not purchased

24     those devices.

25          30.      Plaintiffs were harmed by Defendants' practices, including but not limited to the

26     following:

27             (a)      Costs to purchase the defective HTC mobile device;

28             (b)      Violations of Plaintiffs' legally protected federal, state and common

    law rights of privacy, especially related to unencrypted logging, storage and transmission of

1   Plaintiffs' confidential user data;

2          (c)     Time and expense to remedy the effects of Defendants' actions;

3          (d)     Time and expense to repair Plaintiffs' mobile devices and remedy the

4   impaired operability caused by the Defendants;

5          (e)     Loss of property due to the inability to re-sell Plaintiffs' and Class

6   Members' mobile devices due to the Carrier IQ application; and

7          (f)     Financial harm by the Defendants' unauthorized use of Plaintiffs' and

8   mobile device resources during the unauthorized process of logging and transmitting user

9   data.

10         31.     It is Plaintiffs' belief that HTC IQAgent's logging, collection and transmission

11  of confidential user data on their mobile devices permitted one or more objects within their

12  mobile devices to be used for tracking and analysis by Defendants and/or third parties, thus

13  their mobile device data was obtained in an effort to monitor and profile their mobile device

14  activities. Plaintiffs did not receive notice of the installation of a tracking identifier, did not

15  consent to its installation, and did not want a tracking identifier to be installed on their mobile

16  device. Moreover, Plaintiffs did not authorize Defendants to log, collect, transmit, or store their

17  confidential mobile device data without notice or express consent.

18         32.     Defendants' business practices unfairly wrested from Plaintiffs control over

19  their user data privacy and control over their device resources. Defendants' logging, collection

20  and unencrypted disclosure of Plaintiffs' confidential user data violates user expectations,

21  diminishes user privacy, and contradicts the Manufacturer's Warranty. Defendants caused

22  harm and damages to Plaintiffs' finite device resources, thus preventing Plaintiffs to use the

23  devices for their intended purposes and resulting in instability issues.

24

25  **V.    COMMON EXPERIENCES BETWEEN PLAINTIFFS AND CLASS MEMBERS**

26         33.     At all relevant times herein, the sequence of events, and consequences common

27  to Plaintiffs and Class Members, made the basis of this action, include, but are not limited to

28  the following:

           (a)     Plaintiffs and Class Members are individuals in the United States who

purchased and used an HTC mobile device that had HTC IQAgent software installed and customized by HTC, without notice or consent;

       (b)    HTC a mobile device manufacturer had entered into a legally binding contract with Carrier IQ to host the HTC IQAgent software on its mobile device.

       (c)    Carrier IQ was aware that HTC had preinstalled HTC IQAgent on Plaintiffs' and Class Members' mobile devices, aware. That HTC had customized y HTC IQAgent, aware that HTC IQAgent was "hidden" and did not appear in the launch list of applications installed on Plaintiffs' and Class Members' mobile devices;

       (d)    Plaintiffs and Class Members accessed and used their HTC mobile devices that had the preinstalled or uploaded HTC IQAgent software application;

       (e)    Carrier IQ collected confidential user data from Plaintiffs' and Class Members' mobile devices without the consent of, or notice to, Plaintiffs and Class Members;

       (f)    Carrier IQ sent Plaintiffs' and Class Members' unencrypted confidential mobile device data to its servers located in California without notice to or authorization from Plaintiffs and Class Members;

       (g)    HTC transmitted, and/or allowed access to Plaintiffs' and Class Members' confidential mobile device data, without notice or authorization, to HTC and *any* software with log file access on Plaintiffs' and Class Members' devices. Upon information and belief, this confidential data was unencrypted when stored in the log file and during at least some part of its transmission;

       (h)    Carrier IQ created a database related to Plaintiffs' and Class Members' mobile device data and activities, to assist the Defendant's tracking scheme. Such tracking could not be detected, managed or deleted, and provided, in whole or part, the collective mechanism to track Plaintiffs and Class Members, without notice or consent;

       (i)    Carrier IQ conducted systematic and continuous surveillance of the Plaintiffs' and Class Members' mobile device activity from its headquarters in California which continues to date;

       (j)    Carrier IQ copied, used, and stored Plaintiffs' and Class Members'

mobile device data in California after it knowingly accessed, without authorization, Plaintiffs' and Class Members' mobile devices;

        (k)    Carrier IQ obtained and retained the data in California for a period that far exceeded the purpose claimed by Carrier IQ for obtaining the data;

        (l)    Carrier IQ obtained individually, and in concert with HTC, Plaintiffs' and Class Members' confidential user data, derived, in whole or part, from its monitoring the mobile device activities of Plaintiffs and Class Members. This sensitive information includes but is not limited to incoming text messages, visited URLs and GPS coordinates;

        (m)    HTC and Carrier IQ failed to notify and warn Plaintiffs and Class Members of Carrier IQ's logging and tracking activities involving their mobile devices before, during, or after the unauthorized practices so that Plaintiffs and Class Members were unable to take appropriate actions to opt-out of the unauthorized surveillance by Defendants and other third parties;

        (n)    HTC failed to block access to, and void the licensing agreements of Carrier IQ after it received notice of Carrier IQ's tracking actions made the basis of this action;

        (o)    Carrier IQ and HTC failed to provide any terms of service or privacy policy related to the use of HTC IQAgent for tracking Plaintiffs' and Class Members' mobile activities, or provide an updated privacy policy or any notice alerting users of its activity, made the basis of this action so that Plaintiffs and Class Members had no notice of such activities, nor the ability to mitigate their harm and damage after the fact;

        (p)    Defendants converted Plaintiffs' and Class Members' mobile device data, including but not limited to their incoming text messages, visited URLs and GPS coordinates;

        (q)    Defendants depleted Plaintiffs' and Class Members' mobile device resources while running the HTC IQAgent software, including the device battery power, device memory, CPU, bandwidth and text messages.

    34.    Plaintiffs and Class Members involved with the Defendants were harmed by

Defendants' practices, including but not limited to the following:

(a)     Violations of Plaintiffs' legally protected federal, state and common law rights of commerce and privacy, especially related to unencrypted transmission of Plaintiffs and Class Members' confidential and sensitive user data;

(b)     Financial Harm due to the costs to purchase the defective HTC mobile device;

(c)     Financial Harm due to the time and expense to remedy the effects of Defendants' actions;

(d)     Financial Harm due to the time and expense to repair Plaintiffs' mobile devices and remedy the impaired operability caused by the Defendants;

(e)     Financial Harm due to the loss of property due to the inability to re-sell Plaintiffs' and Class Members' mobile devices due to the Carrier IQ application;

(f)     Financial Harm due to the loss of property due to the unauthorized access and use of Plaintiffs' and Class Members' confidential user data, depriving Plaintiffs and Class Members of such possession and use;

(g)     Financial Harm due to the Defendants' unauthorized use of Plaintiffs' and Class Member's mobile device's battery power, device memory, CPU, bandwidth and text messages during the unauthorized process of obtaining user data;

## VI.     FACTUAL ALLEGATIONS

### A.  Background

35.     On October 26, 1999 the Wireless Communication and Public Act of 1999 was enacted and became known as the "e911 Act." It was an amendment to the Telecommunication Act of 1996. The purpose of the bill was to promote and enhance public safety through the use of 911 as universal assistance number. The Federal Law mandated that mobile phones be embedded with a Global Positioning System ("GPS") chip, which could calculate a user's coordinates to within a few yards by receiving signals from satellites. This law enacted to aid those in harm's way, resulted in the  computing industry developing hardware and software to assist in the development of this technology or mobile devices provided Carrier IQ the impetus

1  to originate a business plan to take advantage of the benefit of embedded GPS chips in all

2  mobile phones for its own commercial benefit:

3               This confluence of circumstances and events— rapid adoption of new
                 wireless technologies, improved resiliency of service, increased data
4               transmission rates, the e911 law requiring homing chips, and market
5               precedents which show that mobile device users are willing to pay for
                 wireless services or applications—establish the feature-rich wireless
6               station as an increasingly logical and compelling channel for the free
                 flow of communications, information, entertainment and commerce.
7

8  United States Patent No.: US 7,609,650 B2, COLLECTION OF DATA AT TARGET

9  WIRELESS DEVICES USING DATA COLLECTION PROFILES, Assignee: Carrier IQ, Inc.,

10  Mountain View, CA (US), Filed: July 5, 2005.

11        36.    Carrier IQ's software is reportedly installed in excess of one hundred and fifty

12  million (150,000,000) mobile devices, including mobile devices manufactured by HTC. These

13  devices installed with HTC IQAgent inherently defective, and Defendants falsely advertised,

14  marketed and distributing these mobile devices, without disclosure of the material facts about

15  the defect, misrepresenting the performance of the devices, violating express and implied

16  warranties, thus rendering the mobile devices unable to be used for their intended purposes.

17  Such activities resulted in a pattern of covert mobile device surveillance, wherein Defendants

18  installed HTC IQAgent on Plaintiffs' and Class Members' mobile device without authorization

19
20  and consent, thereby committing unauthorized access, collection, storage, and use of, the

21  mobile device and data derived from the Plaintiffs' and Class Members' use of the mobile

22  devices and transmitting information, code, and commands to collect, monitor, and remotely

23  store non-anonymized Plaintiffs' and Class Members' confidential mobile device data.

24  Defendants unauthorized access of this confidential, unencrypted data also allowed access to

25  *all* software and applications with log file access so that Plaintiffs' and Class Members' data

26  could be transmitted by multiple unknown parties at any time, *like a pac-man creeping 150*

27  *million mobile phones and "calling home."*

28        37.    The HTC-version of the software, HTC IQAgent, is currently preinstalled by

HTC on its Carrier IQ-enabled mobile devices and was also installed via software updates on

1    older HTC devices.

2    **B.  Carrier IQ: " See What Content They Consume Even Offline"**

3        38.    According to Carrier IQ, the software is designed to monitor, manage and

4    support mobile devices deployed across mobile operators, service providers and enterprises.

5    Carrier IQ's website explains:

6            [HTC IQAgent] provides a level of visibility into true customer
             experience that was, previously unavailable in the mobile industry.
7            [HTC IQAgent] uses data directly from the mobile phone itself to give a
             precise view of how users interact with both their phones and the
8            services delivered through them, even if the phone is not communicating
             with the network.
9

10   http://www.carrieriq.com/overview/IQInsightExperienceManager/index.htm     (last     visited

11   December 5, 2011).

12       39.    HTC IQAgent is a monitoring software that runs continuously in the

13   background reportedly to monitor device and application performance. When a particular event

14   or error associated with the device occurs, the software collects data associated with the event

15   or error and may upload it either in real time or at a later time to its data repository for analysis.

16       40.    During the use of a mobile device in a mobile communication network,

17   parameter data defining conductors associated with the mobile device and operation is

18   generated. The mobile device also generates event data defining events of the mobile device

19   for the associated mobile user. Such events are referred to as "Trigger points."

20       41.    HTC IQAgent is programmed to obtain qualifying characteristics which may

21   include device type, such as manufacturer and model, available memory and battery life, the

22   type of applications resident on the device, the geographical location of the device, usage

23   statistics, including a "profile" that characterizes a user's interaction with a device, and the

24   profile. Such mobile device characteristics are referred to as "metrics."

25       42.    Carrier IQ's patent for "data collection associated with components and services

26   of a wireless communication network" explains the breadth of this data collection,

27

28           Carrier IQ is able to query any metric from a device. A metric can be a
             dropped call because of lack of service. The scope of the word metric is

very broad though, including device type, such as manufacturer and model, available memory and battery life, the type of applications resident on the device, the geographical location of the device, the end user's pressing of keys on the device, usage history of the device, including those that characterize a user's interaction with a device.

http://www.faqs.org/patents/app/20110106942 (last accessed December 2, 2011).

43.     Carrier IQ provides a platform for data collection and management system to dynamically generate and download to a population of wireless devices rule-based data collection by coding its software to function when interfaced with "trigger points" and to obtain "metrics." Data collection profiles may be generated manually by a network administrator, a software developer or other personnel involved in the operation of the network or "network administrators," created offline as a portion of a data analysis solution, or automatically generated based on network .

44.     This parameter data and event data may be used to monitor a network or used by an advertising system of the mobile communications network to select an advertisement and the timing of the display of the advertisement, and is necessary due to the problems associated with mobile advertising.

45.     Mobile Internet advertising currently consists of streaming graphic files, in real time, into content rendered by a user's mobile device browser. Mobile advertising systems though lack reliable browser tracking while traditional online advertising relies on the use of browser cookies. Implementations inherent in conventional mobile ad serving have effectively prevented mobile advertising from being effective because of its inability to obtain mobile device "uniqueness." In order to obtain such uniqueness, the mobile advertising industry sought a means to obtain unique device identifiers which provide a unique reference to individual mobile devices. Unlike traditional cookies, such identifiers are hard coded into a user's phones software, and thus a user has no ability to disable mobile device identifiers.

46.     Mobile Device "tracking" by use of mobile device identifiers is not exactly comparable to any other type of tracking by advertising networks. This is not anonymous data

1  – but an exact ID that's unique to each physical device, and if merged, with mobile device

2  activities, including but not limited to, identifying phone accessed user's physical locations,

3  time of transmission, applications downloaded, social network IDs, providing unlimited

4  advertising opportunities (i.e., commercial value). Recording of a user's GPS, without their

5  knowledge or consent also provides a security harm to the mobile device user. When tracking a

6  user's location data on the mobile device, it is calculated to eight decimal points that can be far

7

8  more exact and accurate than any sort of geographically-based IP address look-up on the web.

9  Instead of getting a general location, location data on a GPS-enabled mobile can identify user's

10  precise latitude and longitude.

11

12      47.    The mobile device industry thus sought the technical means of synchronizing

13  tracking code so that information about individual consumer behavior on mobile devices could

14  be shared between companies and the unique device identifiers used in the majority of mobile

15  devices would be put to this purpose. Carrier IQ initial patent was able to extract unique

16  Identifiers from mobile devices:

17

18  Patent Title: COLLECTION OF DATA AT TARGET WIRELESS DEVICES USING DATA

19  COLLECTION PROFILES SYSTEMS AND METHODS FOR USING DISTRIBUTED

20  NETWORK ELEMENTS TO IMPLEMENT MONITORING AND DATA COLLECTION

21  CONCERNING SELECTED NETWORK PARAMETERS.

22  Patent No.: US 7,609,650 B2

23

24  Assignee: Carrier IQ, Inc., Mountain View, CA (US)

25  Filed: July 5, 2005

26  Inventor: Konstantin Othmer

27      48.    The dilemma facing the mobile advertising industry is that once the mobile

28  device data was extracted a system and method was needed to for wireless devices to use data

for mobile advertising. Provided such a mechanism. While Carrier IQ may have concentrated on extraction of mobile device metrics, other companies were interested in assisting the mobile advertising networks to use mobile device data.

## C. **HTC IQAgent Technology**

i.  *HTC IQAgent Collection of Unencrypted User Data Via Device "Log File"*

49.     Plaintiffs' independent investigation of the HTC IQAgent software revealed a number of interesting factors not found in any study or account by HTC or Carrier IQ:

50.     To monitor use of a mobile device, HTC IQAgent collects user data by utilizing the mobile device's "log file"—a storage file that records certain actions or events that occur on the device in real time, such as when the device is turned on or disconnected from a power source. The log file can be examined by any software or application with Android operating system permission to view it.  Data is populated on the log file when software such as HTC IQ Agent prompts the operating system to append an entry into the log file.

51.     HTC IQAgent specifically prompts mobile operating systems to populate log file data for a number of confidential events, including the following:

(a)     the contents of all incoming text messages;

(b)     the URLs of all websites visited; and

(c)     a user's GPS coordinates.

HTC IQAgent records this data on the log file in an unencrypted format, so the data is available to *any* device software or applications with log file permission. In other words, *any* software or application with Android operating system access can transmit and collect the user's incoming text messages, visited URLs and/or GPS coordinates because of the log file entries populated by HTC IQAgent. This log file access is typically granted to software and applications that a user installs from the market and a user would have no reason to believe that in granting "log file" access, he or she is also granting access to this unencrypted, confidential data.

52.    This puts users' confidential data at great risk. Even if the authors of the software and applications running on the mobile device have the best intentions, if these authors incorporate any third party code into their own software or applications (which is quite common), the users' data is exposed to these other third parties and is jeopardized.

ii.    *HTC IQAgent Transmission of User Data Via Periodic Scheduling and Remote Triggering*

53.    HTC IQAgent provides two mechanisms to transmit confidential data off the device: periodic scheduling and remote triggering. The HTC IQAgent software provides specific "collection points" where the confidential data will be sent. One of these "collection points" encoded in the software is http://collector.sky.carrieriq.com:7001/collector/c?cm_sl=5. Data transmitted to this Carrier IQ server will remain unencrypted and unprotected during data transmission and receipt.

54.    HTC IQAgent can prompt a user's mobile device to send confidential data to Carrier IQ's server on a periodic schedule, e.g., once a week or once a month.  It can also prompt a user's device to send confidential data at any time via a "WAP push request" or a "text request." A WAP push request is a specially-formatted message delivered to the device over a mobile data or internet connection requesting transmission of data from the device. A user would be unaware that a WAP push request had been made to their device. A text request is a standard text message sent to the device with contents beginning with "//CM" or "//IQ." The contents of that message direct the device to transmit data from the device. This text message is "suppressed" or hidden to the operator, meaning that the user does not see the text message and is unaware that Carrier IQ or some other party has requested transmission of confidential data from the device.

iii.    *HTC IQAgent Continuous Unauthorized Data Logging and Transmission*

55.    HTC IQAgent begins logging confidential user data the moment the user first

purchases the mobile device and turns it on, without notice to or consent from the user. HTC IQAgent logs this data silently so that users have no knowledge the data is being logged or is available to any device software or applications with log file permission. The data is also transmitted silently so users are unaware that confidential data is being broadcast from their devices. Data is logged and transmitted even when the device is not in use.

56.     An average user will have no knowledge that the HTC IQAgent software is even running on his or her device, and the HTC IQAgent software does not appear on the device's application launch menu.

57.     A user is unable to stop the Carrier IQ software from running. When a user manually turns off the HTC IQAgent software, it automatically restarts itself seconds later. A user is unable to delete or remove the HTC IQAgent software from the device without voiding HTC's manufacturer's warranty.

58.     The moment a device is turned on, HTC/Google checkin runs. This is completely unrelated to "tell HTC." It sends data out on what the users flashed in recovery (every file installed on a user's phone) IMEI, location and more."Tell HTC" sends ":bugreport:" information.  This means that if a user of an HTC product has an issue they can send HTC a report on it. HTC gives users an on "off switch" that allegedly allows a user to stop the data collection.

59.     One of the first data experts to recognize this was Trevor Eckhart.  He noted that HTC does not stop the data collection, it just stops the way it collects the data. HTC continues to monitor actions and record events through other mechanisms on the phone. Mr. Eckhart explained that

> Carrier IQ is bundled as part of the HTC phone and does not appear in
> any application menu or other software folder.  The application itself is
> called HTCIQAgent.apk.  It's signed (protected) with HTCs crypto keys,

meaning HTC is not responsible for writing the code; however it has been reported the URL sent data to is a not an HTC-owned URL. "Carrier IQ also subverts standard operating system functionality. For any application, I believe standard operating functionality includes having a descriptively named application; a launcher icon, settings menu, widget, or other method to allow the end user to access the application; and a privacy policy clearly available on the device the application is installed on. Also, as seen in the video, only an application named HTC IQAgent is displayed as a running application on my HTC device. A second program called IQRD never makes itself known as a running application.";

CarrierIQ runs the binaries as user root in our ramdisk. The Carrier IQ code is in almost every application: browser, dialer, SMS, media player, the kernel itself, who knows where else.

Trevor Eckhart, Android Security Test, "Carrier IQ Information – Part #2," Online:

http://cryptome.org/isp-spy/carrier-iq-spy2.pdf (last accessed December 1, 2011).

60.     Because the software is preinstalled by HTC and runs as part of the device operating system, data is continuously collected and can be transmitted via wireless internet or other means, even if the device user has no carrier contract and the mobile device is not connected to a mobile network.

    iv.    *HTC IQAgent Depletion of Resources*

61.     Because HTC IQAgent runs continuously and silently, it depletes device resources without notice to or authorization from the user. These depleted resources include:

        (a)     battery power (required to run the device while activity such as data logging and transmission occurs);

        (b)     device memory (used to log confidential user data and receive and respond to WAP push requests and/or text requests);

        (c)     CPU (also known as "central processing unit" used to process the instructions and perform the functions required by the HTC IQAgent software);

        (d)     bandwidth (used to transmit and receive data according to HTC IQAgent instructions); and

        (e)     text messages (HTC IQAgent's hidden text request function indicates

1  a text has been received by the user even when the user cannot see it, and may result in a

2  charges to users who pay for a finite number of texts per month).

3  **D. HTC's Warranty**

4      62.    There is no choice to "opt in" to Carrier IQ's data collection and transmission

5  by downloading HTC IQAgent since in many cases it is preinstalled or installed via automatic

6  update on Plaintiffs' and Class Members' mobile devices. Users cannot uninstall it, block it, or

7

8  cease its actions. HTC and Carrier IQ provide Plaintiffs and Class Members no notice of this

9  software or the functions it performs.

10     63.    HTC's Manufacturer's Warranty for the HTC EVO states that the device is

11  designed to provide users with "reliable, worry-free service." It does not mention or disclose

12  the existence of the HTC IQAgent software on the device or the functions that software

13

14  performs.

15     64.    HTC's Manufacturer's Warranty states that the Warranty will be void if a user

16  alters the operating system or opens or tampers with the device's outer casing, which would

17  include deleting or attempting to delete the HTC IQAgent software from the device.

18  **E. Defendants' Harmful Business Practices**

19

20     65.    Defendants' business practice unfairly wrests the user's control and consumes

21  the resources of the Plaintiffs' and Class Members' mobile devices by gathering information,

22  populating such information in an unencrypted format in their mobile log file, and transferring

23  such information to storage for subsequent use. Defendants caused harm and damages to

24  Plaintiffs' and Class Members' mobile devices finite resources, depleted and exhausted its

25

26  battery power, memory, CPU bandwidth and text, thus causing an actual inability to use it for

27  its intended purposes and resulting in instability issues.

28     66.    Defendants' collection and disclosure of this personal information violates user

expectations, diminished user's privacy, and contradicted the HTC's own representations.

These business practices are unfair and deceptive trade practices as set forth further below.

67.    Defendants harmed Plaintiffs and Class Members when they purchased the HTC device HTC IQAgent. In selecting the HTC mobile device over the service and goods of other competing mobile phone manufacturers, Plaintiffs and Class Members reasonably expected that their confidential user data would not be accessed and transmitted to third parties without their knowledge and consent.

68.    Defendants harmed Plaintiff and Class Members by obtaining their confidential user data and device resources.

69.    Carrier IQ exercises substantial control over its development and functionality on HTC's mobile devices. Carrier IQ and HTC must agree to the terms of Carrier IQ's License Agreement in order to have Carrier IQ function on HTC mobile device. Carrier IQ will only function on mobile devices by interacting with a mobile device's operating system and features in the ways permitted by such an agreement.

70.    Carrier IQ's control of the user experience includes restrictions, such as blocking consumers from modifying its software. As a direct consequence of the control exercised by Carrier IQ, Plaintiffs and the Class cannot reasonably review the privacy effects of HTC IQAgent.

71.    Defendants' activities, made the basis of this action include, but are not limited to, economic harm due to the unauthorized use of Plaintiffs' and Class Members' bandwidth, the amount of data that can be transmitted across a channel in a set amount of time. Any transmission of information on the internet includes bandwidth. Similar to utility companies, such as power or water, the "pipeline" is a substantial capital expenditure, and bandwidth usage controls the pricing model. Hosting providers charge user's for bandwidth because their upstream provider charges them and so forth until it reaches the "back bone providers". Retail

providers purchase it from wholesalers to sell its consumers.

72.     Defendants' activities made the basis of this action consume vast amounts of bandwidth, slowing a user's internet connection by using their bandwidth, in addition to diminishing the mobile devices "battery life," CPU and device memory in order to send, store and retrieve metric data.

73.     Plaintiffs and Class Members were afforded only a millisecond of time after activating their HTC mobile device before HTC IQAgent intentionally, and without users' authorization and consent, accessed Plaintiffs' and Class Members' mobile device. While only the most tech savvy mobile device users are familiar with HTC IQAgent's activity, even a more finite amount of individuals know how to actually remove HTC IQAgent, let alone recognize the risk of that software to their confidential user data.

**VII.     CLASS ACTION ALLEGATIONS**

74.     Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated, as members of the proposed nationwide Class ("Nationwide Class"), defined as follows:

> All consumers in the United States who purchased and used an HTC mobile device on which the HTC IQAgent software resides from December 4, 2007 to December 4, 2011.

75.     Plaintiffs also bring certain of the claims on behalf of itself and a portion of the class described as the Texas subclass ("Texas Subclass"), defined as follows:

> All consumers residing within the State of Texas who purchased and used an HTC mobile device on which the HTC IQAgent software resides from December 4, 2007 to December 4, 2011.

76.     Excluded from the Nationwide Class and Texas Subclass are the officers, directors, and employees of Carrier IQ and HTC, and their respective legal representatives, heirs, successors and assigns.

77.     This action is brought as a class action and may properly be so maintained

1    pursuant to the provisions of Federal Rule of Civil Procedure 23. Plaintiffs reserve the right to

2    modify the Nationwide Class and the Texas Subclass definitions and the class period pursuant

3    to discovery that is conducted hereafter.

4        78.    The members of the Class are so numerous that joinder of all members would

5    be impracticable. Plaintiffs estimate that there are hundreds of thousands of consumers who

6    purchased HTC mobile devices installed with the HTC IQAgent software.

7        79.    There are questions of law and fact common to the members of the Class that

8    predominate over any questions affecting only individual members, including:

9            (a)    whether Defendants omitted, misrepresented or otherwise failed to

10   notify Class Members of the fact that HTC IQAgent was installed on Plaintiffs' and Class

11   Members' mobile devices;

12           (b)    whether Defendants omitted, misrepresented or otherwise failed to

13   notify Class Members of the fact that HTC IQAgent logs unencrypted data in the device log

14   file that includes incoming text messages, visited URLs and GPS location coordinates;

15           (c)    whether Defendants omitted, misrepresented or otherwise failed to

16   notify Class Members of the fact that HTC IQAgent utilizes finite device resources such as

17   battery power, device memory, CPU, bandwidth and text messages;

18

19           (d)    whether   Defendants'   conduct   violates   the   federal   Electronic

20   Communications Privacy Act

21           (e)    whether   Defendants'   conduct   violates   the   federal   Stored

22   Communications Act;

23           (f)    whether Defendants' conduct violates California's Consumers Legal

24   Remedies Act;

25           (g)    whether Defendants' conduct violates Texas's Deceptive Trade

26   Practices Act;

27           (h)    whether Defendants were negligent in their failure to disclose the

28   presence of HTC IQAgent on Plaintiffs' and Class Members' mobile devices and/or their

     failure to seek Plaintiffs' and Class Members' consent prior to logging, collecting and

transmitting confidential user data;

       (a)    whether Defendants' conduct constitutes trespass; and

       (b)    whether Defendants were unjustly enriched from their conduct, and whether they must disgorge profits to Plaintiffs and Class Members.

80.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs have no interests antagonistic to those of the Class and are subject to no unique defenses.

81.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained attorneys experienced in class and complex litigation.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

       (a)    It is economically impractical for each member of the Class to prosecute individual actions;

       (b)    The Class is readily definable;

       (c)    Prosecution as a class action will eliminate the possibility of repetitious litigation;

       (d)    A class action will enable claims to be handled in an orderly and expeditious manner;

       (e)    A class action will save time and expense and will ensure uniformity of decisions; and

       (f)    Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

83.    Defendants have acted and refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

VIII.    **CAUSES OF ACTION**

### FIRST CAUSE OF ACTION

**Violation of the Electronic Communications Privacy Act 18 U.S.C. § 2510**

**Against All Defendants**

84.    Plaintiffs incorporate by reference all paragraphs previously alleged herein.

85.    Plaintiffs assert this claim against each and every Defendant named herein in this complaint on behalf of themselves and the Class.

86.    The Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, referred to as "ECPA," regulates wire and electronic communications interception and interception of oral communications, and makes it unlawful for a person to "willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," within the meaning of 18 U.S.C. § 2511(1).

87.    Defendants violated 18 U.S.C. § 2511 by intentionally acquiring and/or intercepting, by device or otherwise, Plaintiffs' and Class Members' electronic communications, without knowledge, consent, or authorization.

88.    At all relevant times, Defendants engaged in business practices of intercepting and collecting the Plaintiffs' and Class Members' confidential electronic communications which included incoming text messages, URLs of websites viewed and GPS coordinates from within their mobile devices. Once Defendants obtained this confidential personal information, Defendants used it to aggregate mobile device data regarding Plaintiffs' and Class Members' uses of their mobile devices. Defendants also made this confidential and unencrypted data available to any device software or application with log file access, further violating Plaintiffs' and Class Members' privacy.

89.    The contents of data transmissions from and to Plaintiffs' and Class Members' personal computers constitute "electronic communications" within the meaning of 18 U.S.C. §2510.

90.    Plaintiffs and Class Members are "person[s] whose ... electronic communication is intercepted ... or intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520.

91.    Defendants violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept

1   Plaintiffs' and Class Members' electronic communications.

2        92.    Defendants violated 18 U.S.C. § 2511(1)(c) by intentionally disclosing, or

3   endeavoring to disclose, to any other person the contents of Plaintiffs' and Class Members'

4   electronic communications, knowing or having reason to know that the information was

5   obtained through the interception of Plaintiffs' and Class Member's electronic

6   communications.

7        93.    Defendants violated 18 U.S.C. § 2511(1)(d) by intentionally using, or

8   endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications,

9   knowing or having reason to know that the information was obtained through the interception

10  of Plaintiffs' and Class Members' electronic communications.

11       94.    Defendants' intentional interception of these electronic communications without

12  Plaintiffs' or Class Members' knowledge, consent, or authorization was undertaken without a

13  facially valid court order or certification.

14       95.    Defendants intentionally used such electronic communications, with knowledge,

15  or having reason to know, that the electronic communications were obtained through

16  interception, for an unlawful purpose.

17       96.    Defendants unlawfully accessed and used, and voluntarily disclosed, the

18  contents of the intercepted communications to enhance their profitability and revenue through

19  manufacturer contracts and advertising. This access and disclosure was not necessary for the

20  operation of Defendants' system or to protect Defendants' rights or property.

21       97.    The Electronic Communications Privacy Act of 1986, 18 USC §2520(a)

22  provides a civil cause of action to "any person whose wire, oral, or electronic communication

23  is intercepted, disclosed, or intentionally used" in violation of the ECPA.

24       98.    Defendants are liable directly and/or vicariously for this cause of action.

25  Plaintiffs therefore seek remedy as provided for by 18 U.S.C. §2520, including such

26  preliminary and other equitable or declaratory relief as may be appropriate, damages consistent

27  with subsection (c) of that section to be proven at trial, punitive damages to be proven at trial,

28  and a reasonable attorney's fee and other litigation costs reasonably incurred.

99.    Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy. Defendants exposed Plaintiffs' and Class Members' personal information to any third party software or application with log file access residing on their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an unencrypted format. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of the resources of Plaintiff's and Class Members' mobile devices including battery power, device memory, CPUs, and bandwidth. Plaintiffs and Class Members had unauthorized charges to their mobile devices for every hidden text message that was sent by Defendants.

100.    Plaintiffs and the Class, pursuant to 18 U.S.C. §2520, are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations. Unless restrained and enjoined, Defendants will continue to commit such acts. Plaintiffs' and Class Members' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiffs and Class Members to remedies including injunctive relief as provided by 18 U.S.C. § 2510.

## SECOND CAUSE OF ACTION

### Violation of the Stored Communications Act, 18 U.S.C. §2701

### Against All Defendants

101.    Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

102.    The Stored Communications Act prohibits persons from accessing without authorization a device through which an electronic communications service is provided (18 U.S.C. §2701).

103.    Defendants were engaged in the sale of mobile devices to consumers during the class period.

104.    Defendants intentionally accessed and collected the personal data of Plaintiffs

1   and Class Members on their mobile devices without notice or authorization, including

2   incoming text messages, URLs of websites viewed and GPS coordinates.

3       105.   As a result of Defendants' unlawful violation of this section, Plaintiffs and Class

4   Members have been damaged by among other things, failing to receive the benefits of a

5   product impliedly represented to them as secure as to their personal information. Plaintiffs and

6   Class Members have additionally suffered loss by reason of these violations, including

7   violation of their rights of privacy. Defendants exposed Plaintiffs' and Class Members'

8   personal information to any third party software or application with log file access residing on

9   their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an

10  unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized

11  use of the resources of Plaintiffs' and Class Members' mobile devices including battery power,

12  cell phone memory, CPUs, and bandwidth. Moreover, Plaintiffs and Class Members had

13  unauthorized charges to their mobile devices for every hidden text message that was sent by

14  Defendants.

15      106.   Plaintiffs and Class Members have been harmed by Defendants' unlawful

16  violations of this section and are therefore entitled to relief in the form of damages, costs and

17  disbursements, including costs of investigation and reasonable attorney's fees and are entitled

18  to equitable relief as determined by this Court.

19

20                          **THIRD CAUSE OF ACTION**

21              **Violation of the Consumer Legal Remedies Act**

22            **("CLRA") California Civil Code § 1750, *et seq.***

23                        **Against All Defendants**

24      107.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

25      108.   In violation of Civil Code §1750, et seq. (the "CLRA"), Defendants have

26  engaged and are engaging in unfair and deceptive acts and practices in the course of

27  transactions with Plaintiffs, and such transactions are intended to and have resulted in the sales

28  of services to consumers. Plaintiffs and the Class Members are "consumers" as that term is

    used in the CLRA because they sought or acquired Defendants' goods or services for personal,

family, or household purposes.

109. At all relevant times, Defendants' business practices of selling HTC mobile devices installed or updated with HTC IQAgent software, were goods Plaintiffs and Class Members obtained for use. Defendants' scheme to offer such goods misled Plaintiffs and Class Members about the nature and integrity of theHTC mobile devices since Defendants intended to use such for mobile device tracking, collection of confidential, unencrypted user data, and depletion of consumer resources, including battery power, device memory, CPUs, and bandwidth. Defendants also charged consumers for every hidden text message that was sent by Defendants.

110. Defendants represented that their services had characteristics, uses, and benefits that they do not have, in violation of Civil Code § 1770(a)(5). Defendants represented privacy and "reliable, worry-free service" as a characteristic of the mobile devices that they did not have. Defendants intercepted and collected Plaintiffs' and Class Members' electronic communications which included incoming text messages, URLs of websites viewed and GPS coordinates from within their mobile devices. Once Defendants obtained this personal information, Defendants used it to aggregate mobile device data of Plaintiffs and Class Members as they used their mobile device. Defendants made this personal information available, unencrypted, to any third party software or applications with log file access on the device and further violated Plaintiffs' and Class Members' privacy.

111. In addition, Defendants' modus operandi constitutes an unfair practice in that Defendants knew, or should have known, that consumers care about the status of personal information regarding visited websites, GPS location and text privacy but were unlikely to be aware of the manner in which Defendants failed to fulfill their commitments with respect to the consumers' privacy.

112. Defendants' acts and practices were deceptive and unfair because they were likely to mislead the members of the public to whom they were directed.

113. Plaintiffs and Class Members have suffered loss by reason of these violations, including, without limitation, violation of the right of privacy. Defendants exposed Plaintiffs'

and Class Members' personal information to any third party software or application with log file access residing on their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of the resources of Plaintiffs' and Class Members' mobile devices including battery power, cell phone memory, CPUs, and bandwidth. Moreover, Plaintiffs and Class Members had unauthorized charges to their mobile devices for every hidden text message that was sent by Defendants.

114. Plaintiffs, on behalf of themselves and on behalf of each member of the Class, shall seek individual restitution, injunctive relief, and other relief as the Court deems just and proper.

115. Pursuant to California Civil Code, Section 1782, Plaintiffs will notify Defendants in writing of the particular violations of Civil Code, Section 1770 and demand that Defendants rectify the problems associated with its behavior detailed above, which acts and practices are in violation of Civil Code Section 1770.

## FOURTH CAUSE OF ACTION

### Violation of Unfair Competition California Business and Professions Code § 17200
### Against All Defendants

116. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

117. In violation of California Business and Professions Code Section 17200 et seq., Defendants' conduct in this regard is ongoing and includes, but is not limited to, unfair, unlawful and fraudulent conduct.

118. At all relevant times, Defendants' business practices as alleged above constitute unlawful, unfair and fraudulent business acts and practices.

119. Defendants engaged in these unfair and fraudulent practices to increase their profits. Plaintiffs were injured and damaged by being forced to relinquish—without consent or knowledge—confidential and personal user data, device battery power, device memory, CPUs, and bandwidth. Plaintiffs were also unfairly charged for every hidden text message that was sent by Defendants.

120. By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of the UCL and, as a result, Plaintiffs and the Class have suffered injury-in-fact and have lost money and/or property.

### A. Unlawful Business Act and Practices

121. Defendants' business acts and practices are unlawful, in part, because they violate the Electronic Communications Privacy Act, 18 U.S.C. Section 2510 which prohibits any person from willfully intercepting or endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication, including incoming text messages.

122. Defendants' business acts and practices are also unlawful in that they violate the Stored Communications Act, 18 U.S.C. Section 2701, California Consumer Legal Remedies Act, California Civil Code §1750, and California Penal Code, § 502 among other statutes.

### B. Unfair Business Act and Practices

123. Defendants' business acts and practices are unfair because they cause harm and injury-in-fact to Plaintiffs and Class Members and for which Defendants have no justification other than to increase revenues from the unauthorized use of personal information

124. Defendants' conduct lacks reasonable and legitimate justification in that Defendants have benefited from such conduct and practices while Plaintiffs and the Class Members have been misled as to the nature and integrity of Defendants' services and have, in fact, suffered injury regarding the privacy and confidentiality of their personal information and the use of their device resources. Defendants' conduct offends public policy in California in connection with the Consumer Legal Remedies Act, the state constitutional right of privacy, and California statutes recognizing the need for consumers to safeguard their own privacy interests, including California Civil Code, Section 1798.80.

125. In addition, Defendants' actions constitute an unfair practice in that Defendants knew, or should have known, that consumers care about the status of personal information regarding visited websites, GPS location and text privacy but were unlikely to be aware of the

1    manner in which Defendants failed to fulfill their commitments with respect to the consumers'

2    privacy.

3         126.    Defendants' acts and practices were fraudulent within the meaning of the Unfair

4    Competition Law because they were likely to mislead the consumers.

5         127.    Defendants' practice of capturing, storing, and transferring highly detailed and

6    personal records of consumers' incoming text messages, URLs of websites visited and GPS

7    location histories, and storing such information in unencrypted form, is in violation of the

8    Unfair Competition Law. Plaintiffs and Class Members have suffered loss by reason of these

9    violations, including, violation to their right of privacy. Defendants exposed Plaintiffs' and

10   Class Members' personal information to any third party software or applications with log file

11   access residing on their mobile devices without Plaintiffs' or Class Members' consent or

12   knowledge, and in an unencrypted form. Plaintiffs and Class Members were damaged by

13   Defendants' unauthorized use of the resources of Plaintiff's and Class Members' mobile

14   devices including battery power, cell phone memory, CPUs, and bandwidth. Moreover,

15   Plaintiffs and Class Members had to pay unauthorized charges to their mobile devices for

16   every hidden text message that was sent by Defendants.

17                          **FIFTH CAUSE OF ACTION**

18                  **Violation of California's Computer Crime Law**

19                          **Penal Code § 502 et seq.**

20                              **Against All Defendants**

21        128.    Plaintiffs incorporate the above allegations by reference as if set forth herein at

22   length.

23        129.    The California Computer Crime Law, California Penal Code Section 502

24

25   regulates "tampering, interference, damage, and unauthorized access to lawfully created

26   computer data and computer systems." A mobile device is a "computer system" as defined in

27   Penal Code Section 502(b)(5) in that it contains electronic instructions, inputs and outputs data,

28   performs functions including communication and data storage and retrieval.

          130.    Defendants violated California Penal Code § 502 by knowingly accessing,

copying, using, making use of, interfering, and/or altering, data belonging to Plaintiffs and Class Members: (1) in and from the State of California; (2) in the home states of the Plaintiffs and Class Members; and (3) in the state in which the servers that provided the communication link between Plaintiffs and the applications they interacted with were located.

131. At all relevant times, Defendants had a business practice of accessing Plaintiffs' and Class Members' mobile devices on a systematic and continuous basis in order to obtain mobile device data and to monitor and collect data related to their browsing habits, GPS locations and incoming text messages. Defendants accessed such data without notice to or authorization from Plaintiffs or Class Members.

132. Pursuant to California Penal Code § 502(b)(1), "Access means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network."

133. Pursuant to California Penal Code § 502(b)(6), "Data means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."

134. Defendants have violated California Penal Code § 502(c)(1) by knowingly accessing and without permission, altering, and making use of data from Plaintiffs' and Class Members' mobile devices in order to devise and execute business practices to deceive Plaintiffs and Class Members into surrendering private electronic communications, and to wrongfully obtain valuable private data and device resources from Plaintiffs and Class Members.

135. Defendants have violated California Penal Code § 502(c)(2) by knowingly accessing and without permission, taking, or making use of data from Plaintiffs' and Class Members' mobile devices.

136. Defendants have violated California Penal Code § 502(c)(3) by knowingly and without permission, using and causing to be used Plaintiffs' and Class Members' mobile computing devices' services and resources.

137.   Defendants have violated California Penal Code section 502(c)(4) by knowingly accessing and, without permission, adding and/or altering the data from Plaintiffs' and Class Members' computers, including application code installed on such computers.

138.   Defendants have violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiffs' mobile device and mobile device system.

139.   Defendants has violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' mobile device and mobile device system.

140.   California Penal Code § 502(j) states: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

141.   Plaintiffs and Class Members have suffered loss by reason of these violations, including, without limitation, violation of the right of privacy. Defendants exposed Plaintiffs' and Class Members' personal information to any third party software or application with log file access residing on their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of the resources of Plaintiff's and Class Members' mobile devices including battery power, cell phone memory, CPUs, and bandwidth. Plaintiffs and Class Members had unauthorized charges to their mobile devices for every hidden text message that was sent by Defendants.

142.   Plaintiffs have also suffered irreparable injury from these unauthorized acts of disclosure, to wit: their personal, private, and sensitive electronic data was obtained and used by Defendant. Due to the continuing threat of such injury, Plaintiffs have no adequate remedy at law, entitling Plaintiffs to injunctive relief.

143.   Plaintiffs and Class Members have additionally suffered loss by reason of these

1   violations, including, without limitation, violation of the right of privacy and depletion of

2   valuable device resources.

3       144.    As a direct and proximate result of Defendants' unlawful conduct within the

4   meaning of California Penal Code § 502, Defendants have caused loss to Plaintiffs in an

5   amount to be proven at trial. Plaintiffs are also entitled to recover their reasonable attorneys'

6   fees pursuant to California Penal Code § 502(e).

7       145.    Plaintiffs and the Class Members seek compensatory damages, in an amount to

8   be proven at trial, and injunctive or other equitable relief.

9                           **SIXTH CAUSE OF ACTION**

10              **Violation of the California Invasion of Privacy Act**

11                          **Penal Code § 630 et seq.**

12                          **Against All Defendants**

13      146.    Plaintiffs incorporate the above allegations by reference as if set forth herein at

14  length.

15      147.    California Penal Code Section 630 provides, in part:

16

17              Any person who, . . . or who willfully and without the consent of
                all parties to the communication, or in any unauthorized manner,

18              reads, or attempts to read, or to learn the contents or meaning of
                any message, report, or communication while the same is in

19              transit or passing over any wire, line, or cable, or is being sent
                from, or received at any place within this state; or who uses, or

20              attempts to use, in any manner, or for any purpose, or to
                communicate in any way, any information so obtained, or who

21              aids, agrees with, employs, or conspires with any person or
                persons to unlawfully do, or permit, or cause to be done any of

22              the acts or things mentioned above in this section, is punishable. .

23

24      148.    At all relevant times, Defendants engaged in a business practice of accessing the

25  mobile device data of the Plaintiffs and Class Members without their authorization and consent

26  and systematically logging and collecting their incoming text messages, URLs of websites

27  viewed and GPS coordinates. Defendants made this personal data available to all third party

28  software or applications with log file access on the mobile devices of Plaintiffs and Class

    Members in an unencrypted form, without the consent or authorization of Plaintiff or Class

1    Members.

2        149.    On information and belief, each Plaintiff and each Class Member, during one or

3    more of their interactions on their mobile device, including receipt of text messages and URL

4    browsing, communicated with one or more web entities based in California, or with one or

5    more entities whose servers were located in California.

6        150.    Communications from the California web-based entities to Plaintiffs and Class

7    Members were sent from California. Communications to the California web-based entities

8    from Plaintiffs and Class Members were sent to California.

9        151.    Plaintiffs and Class Members did not consent to any of the Defendants' actions

10   in intercepting, reading, and/or learning the contents of their communications with such

11   California-based entities.

12       152.    Plaintiffs and Class Members did not consent to any of the Defendants' actions

13   in using the contents of their communications with such California-based entities.

14       153.    Neither Defendant is a " public utility engaged in the business of providing

15   communications services and facilities . . . ."

16       154.    The actions alleged herein by the Defendants were not undertaken "for the

17   purpose of construction, maintenance, conduct or operation of the services and facilities of the

18   public utility."

19       155.    The actions alleged herein by the Defendants were not undertaken in connection

20   with "the use of any instrument, equipment, facility, or service furnished and used pursuant to

21   the tariffs of a public utility."

22       156.    The actions alleged herein by Defendants were not undertaken with respect to

23   any telephonic communication system used for communication exclusively within a state,

24   county, city and county, or city correctional facility.

25       157.    Defendants directly participated in intercepting, reading, and/or learning the

26   contents of the communications between Plaintiffs, Class Members and California-based web

27   entities.

28       158.    Alternatively, and of equal violation of the California Invasion of Privacy Act,

HTC aided, agreed with, and/or conspired with Carrier IQ to unlawfully do, or permit, or cause to be done all of the acts complained of herein.

159.    Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy. Defendants exposed Plaintiffs' and Class Members' personal information to any third party software or application with log file access residing on their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of the resources of Plaintiff's and Class Members' mobile devices including battery power, cell phone memory, CPUs, and bandwidth. Moreover, Plaintiffs and Class Members had unauthorized charges to their mobile devices for every hidden text message that was sent by Defendants.

160.    Unless restrained and enjoined, Defendants will continue to commit such acts. Pursuant to § 637.2 of the California Penal Code, Plaintiffs and the Class have been injured by the violations of California Penal Code Section 631. Wherefore, Plaintiffs, on behalf of themselves and on behalf of a similarly situated Class of consumers, seek damages and injunctive relief.

SEVENTH CAUSE OF ACTION

Violation of the Song-Beverly Warranty Act, California Civil Code §1792

Against All Defendants

161.    Plaintiffs hereby incorporate by reference the allegations contained in all the paragraphs of this Complaint.

162.    HTC warranted to Plaintiffs and Class Members in its "Manufacturer's Warranty" that the mobile devices would be free from defects for normal consumer usage for twelve months from the date of purchase.

163.    HTC by offering mobile devices in the marketplace represented and warranted to Plaintiffs and Class Members that these devices did not cause personal information to be unreasonably and unexpectedly transferred to third parties.

164.    Plaintiffs and Class Members paid more for their mobile devices than they

1   would have paid if HTC disclosed the fact that the mobile devices were designed with defects,

2   namely the privacy breach to Carrier IQ and any other third party software on the mobile

3   device.

4   165.   A reasonable consumer would, and Plaintiffs and Class Members did expect

5   that, if HTC mobile devices were subject to defects such as those identified above, HTC would

6   disclose these material facts and Plaintiffs and Class Members would not have purchased these

7   devices.

8   166.   Plaintiffs and Class Members paid premiums for HTC mobile devices because

9   they reasonably believed the devices were designed to employ reasonable security in their

10   operation.

11   167.   HTC's failure to meet the specifications of the mobile devices violates the

12   express and implied warranties under the Song-Beverly Warranty Act, California Civil Code

13   §1792 et.seq.

14

15   168.   Moreover, HTC asserts that disabling the Carrier IQ software on a mobile

16   device voids the HTC Warranty.  Plaintiffs and Class Members are therefore forced to induce

17   breach of the HTC Warranty by disabling the Carrier IQ software to protect their personal

18   information.

19   169.   Plaintiffs and Class Members who purchased the mobile devices are entitled to

20   a refund of the purchase price.

21   **EIGHTH CAUSE OF ACTION**

22   **Texas Deceptive Trade Practices Act, Business and Commerce**

23   **Code § 17.41 et seq.**

24   **Against All Defendants**

25   170.   Plaintiffs hereby incorporate by reference the allegations contained in all of the

26   preceding paragraphs of this complaint.

27   171.   Plaintiffs are "consumers" under the Texas Deceptive Trade Practices Act as

28   they purchased and used HTC mobile devices that had been preinstalled with the Carrier IQ

tracking program.

172.   Defendants are proper "persons" or defendants under the Texas Deceptive Trade Practices Act, who either used or employed false, misleading, deceptive or unconscionable acts or practices, or were directly connected with the transaction with Plaintiffs.

173.   Defendants committed multiple violations and wrongful acts under the Texas Deceptive Trade Practices Act, including the following: making or committing, false, misleading or deceptive acts and/or practices, including but not limited to violations of Tex. Business & Commerce Code § 17.46(b) (3), (5), (7), (9), (20), and (24). Defendants committed misleading and unconscionable acts in connection with the sale of mobile devices installed or updated with HTC IQAgent to Plaintiffs and Class Members, and the subsequent tracking and logging of Plaintiffs' and Class Members' confidential, unencrypted through HTC IQAgent without notice or consent. In carrying out these acts, Defendants depleted Plaintiffs' and Class Members' mobile device resources without notice to or consent from Plaintiffs or Class Members. Plaintiffs and Class Members relied on Defendants' acts and/or practices to their detriment.

174.   Plaintiffs will show that the violation and actions of Defendants were a producing cause of their damages. Defendants exposed Plaintiffs' and Class Members' personal information to any third party software or applications with log file access residing on their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of Plaintiffs' and Class Members' mobile device resources including battery power, cell phone memory, CPUs, and bandwidth. Moreover, Plaintiffs and Class Members had unauthorized charges to their mobile devices for every hidden text message that was sent by Defendants.

175.   Plaintiffs will show that the violations and actions of Defendants were done intentionally or knowingly, entitling Plaintiffs to treble damages.

176.   Plaintiffs will show that the violations and actions of Defendants entitle them to reasonable and necessary attorney's fees under the Texas Deceptive Trade Practices Act,

1    specifically Tex, Business & Commerce Code § 17.50(d).

2                           **NINTHCAUSE OF ACTION**

3                           **Breach of Express Warranty**

4                           **Against Defendant HTC**

5        177.    Plaintiffs hereby incorporate by reference the allegations contained in all the

6    paragraphs of this Complaint.

7        178.    HTC warranted to Plaintiffs and Class Members in its "Manufacturer's

8    Warranty" that the mobile devices would be free from defects for normal consumer usage for

9    twelve months from the date of purchase and that the device was designed to provide "reliable,

10   worry-free service."

11       179.    HTC by sold mobile devices to Plaintiffs and Class Members that were

12   defective because they caused personal information to be unreasonably and unexpectedly

13   viewed and collected by Carrier IQ and other third party software and applications. The

14   devices also were subject to depletion of resources through the HTC IQAgent software which

15   depleted those resources without notice to or authorization from Plaintiffs or Class Members.

16       180.    Plaintiffs and Class Members paid more for their mobile devices than they

17   would have paid if HTC disclosed the fact that the mobile devices were designed with defects,

18   namely the privacy breach and depletion of mobile device resources.

19       181.    A reasonable consumer would, and Plaintiffs and Class Members did expect

20   that, if HTC mobile devices were subject to defects such as those identified above, HTC would

21   disclose these material facts and Plaintiffs and Class Members would not have purchased these

22   devices.

23

24       182.    Plaintiffs and Class Members paid premiums for HTC mobile devices because

25   they reasonably believed the devices were designed to employ reasonable security in their

26   operation.

27       183.    HTC's failure to provide to Plaintiffs and Class Members a mobile device that is

28   not defective is a violation of HTC's express warranty.

         184.    Moreover, HTC asserts that disabling the Carrier IQ software on a mobile

1  device voids the HTC warranty. Plaintiffs and Class Members are therefore forced by HTC to

2  induce breach of the HTC Warranty by disabling the Carrier IQ software to protect their

3  personal information.

4      185.   Plaintiffs and Class Members who purchased the mobile devices are entitled to

5  a refund of the purchase price.

## TENTH CAUSE OF ACTION

### Breach of Implied Warranty

### Against Defendant HTC

9      186.   Plaintiffs hereby incorporate by reference the allegations contained in all the

10  paragraphs of this Complaint.

11      187.   HTC by offering mobile devices in the marketplace represented and warranted

12  to Plaintiffs and Class Members that these devices would be free from defects for normal

13  consumer usage and would not cause personal information to be unreasonably and

14  unexpectedly transferred to third parties.

15      188.   HTC by sold mobile devices to Plaintiffs and Class Members that were

16  defective because they caused personal information to be unreasonably and unexpectedly

17  viewed and collected by Carrier IQ and other third party software and applications. The

18  devices also were subject to depletion of resources through the HTC IQAgent software which

19  depleted those resources without notice to or authorization from Plaintiffs or Class Members.

20      189.   Plaintiffs and Class Members paid more for their mobile devices than they

21  would have paid if HTC disclosed the fact that the mobile devices were designed with defects,

22  namely the privacy breach and depletion of mobile device resources..

23      190.   A reasonable consumer would, and Plaintiffs and Class Members did expect

24  that, if HTC mobile devices were subject to defects such as those identified above, HTC would

25  disclose these material facts and Plaintiffs and Class Members would not have purchased these

26  devices.

27      191.   Plaintiffs and Class Members paid premiums for HTC mobile devices because

28  they reasonably believed the devices were designed to employ reasonable security in their

1   operation.

2   192.   HTC's failure to provide to Plaintiffs and Class Members a mobile device that is

3   not defective is a violation of HTC's implied warranty.

4   193.   Plaintiffs and Class Members who purchased the mobile devices are entitled to

5   a refund of the purchase price.

6   ## ELEVENTH CAUSE OF ACTION

7   ### Negligence

8   ### Against All Defendants

9   194.   Plaintiffs incorporate the above allegations by reference as if fully set forth

10   herein.

11   195.   Carrier IQ and HTC owed a duty of care to Plaintiffs and Class Members.

12   196.   Carrier IQ and HTC breached their duty by negligently designing HTC IQAgent

13   and preinstalling or uploading it to Plaintiffs' and Class Members' mobile devices without any

14   notice or authorization so that Defendants could acquire personal information without

15   Plaintiffs' and Class Members' knowledge or permission. Defendants also negligently made

16   this confidential data available to any software or application with log file access on the mobile

17   device, in an unencrypted format. Defendants also negligently depleted Plaintiffs' and Class

18   Members' mobile device resources.

19

20   197.   Carrier IQ and HTC failed to fulfill their own commitments to Plaintiffs and

21   Class Members, and further failed to fulfill even the minimum duty of care to protect

22   Plaintiffs' and Class Members' personal information, privacy rights, security, and device

23   resources.

24   198.   HTC's unencrypted storage of Plaintiffs' and Class Members' on the mobile

25   device log file and Carrier IQ servers was negligent.

26   199.   Plaintiffs and Class Members were harmed as a result of Carrier IQ's breaches

27   of its duty, and Carrier IQ proximately caused such harms.

28   200.   HTC's failure to fulfill its commitments included allowing Carrier IQ's practice

of preinstalling HTC IQAgent on HTC mobile device users' devices without notice or

authorization and then permitting Carrier IQ to collect unencrypted data in the log file and make it available, unencrypted, to third party software and applications with log file access on the devices. HTC engaged in these activities without notice to or consent from Plaintiffs and Class Members.

201. HTC's preinstallation or upload of HTC IQAgent and unauthorized use of Plaintiffs' and Class Members' confidential information without notice to or consent from Plaintiffs or Class Members was negligent.

202. Defendants exposed Plaintiffs' and Class Members' personal information to any third party software with log file access residing on their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of the resources of their mobile devices including battery power, cell phone memory, CPUs, and bandwidth. Moreover, Plaintiffs and Class Members had unauthorized charges to their mobile devices for every hidden text message that was sent by Carrier IQ.

203. Plaintiffs and Class Members were harmed as a result of Defendants' breaches of their duty, and Defendants proximately caused such harms.

### TWELFTH CAUSE OF ACTION

#### Trespass to Personal Property/Chattels

#### Against All Defendants

204. Plaintiffs incorporate by reference all paragraphs previously alleged herein.

205. The common law prohibits the intentional intermeddling with personal property, including a mobile device, in possession of another which results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

206. By engaging in the acts alleged in this complaint without the authorization or consent of Plaintiffs and Class Members, Defendants dispossessed Plaintiffs and Class Members from use and/or access to their mobile devices, or parts of them. Further, these acts impaired the use, value, and quality of Plaintiffs' and Class Members' mobile devices.

1    Defendants' acts constituted an intentional interference with the use and enjoyment of their

2    mobile devices. By the acts described above, Defendants have repeatedly and persistently

3    engaged in trespass to personal property in violation of the common law.

4         207.    Without Plaintiffs' and Class Members' consent, or in excess of any consent

5    given, Defendants knowingly and intentionally accessed Plaintiffs' and Class Members'

6    property, thereby intermeddling with Plaintiffs' and Class Members' right to possession of the

7    property and causing injury to Plaintiffs and the members of the Class.

8         208.    Defendants engaged in deception and concealment in order to gain access to

9    Plaintiffs' and Class Members' mobile devices.

10        209.    Defendants undertook the following actions with respect to Plaintiffs' and Class

11   Members' mobile devices:

12        210.    Defendants  accessed and obtained control over the users' mobile device;

13        211.    Defendants caused the installation of code on the hard drives of the mobile

14   devices;

15        212.    Defendants programmed the operation of its code to circumvent the mobile

16   device owners' privacy and security controls, to remain beyond their control, and to continue

17   to function and operate without notice to them or consent from Plaintiffs and Class Members;

18        213.    Defendants obtained users' personal information by logging confidential data in

19   the log file;

20        214.    Defendants utilized users' mobile device resources as part of logging

21   confidential data; and

22        215.    Defendants used the log file data to obtain information about the mobile

23   browsing activities of the mobile device without the user's consent, and outside of the control

24   of the owner of the mobile device.

25        216.    All these acts described above were acts in excess of any authority any user

26   granted Defendants when the user purchased the HTC mobile device that had HTC IQAgent

27   preinstalled or updated on the device without the user's consent or knowledge. By engaging in

28   deception and misrepresentation, whatever authority or permission Plaintiffs and Class

1    Members may have granted to Defendants was exceeded.

2         217.   Defendants' installation and operation of its program used, interfered, and/or

3    intermeddled with Plaintiffs' and Class Members' mobile devices. Such use, interference

4    and/or intermeddling was without Plaintiffs' and Class Members' consent or, in the alternative,

5    in excess of Plaintiffs' and Class Members' consent.

6         218.   Defendants' installation and operation of its program constitutes trespass,

7    nuisance, and an interference with Plaintiffs' and Class Members' chattels, to wit, their mobile

8    devices.

9         219.   Defendants' installation and operation of the Carrier IQ program impaired the

10   condition and value of Plaintiffs' and Class Members' mobile devices.

11        220.   Defendants' trespass to chattels, nuisance, and interference caused real and

12   substantial damage to Plaintiffs and Class Members  Defendants exposed Plaintiffs' and Class

13   Members' personal information to any third party software with log file access residing on

14   their mobile devices without Plaintiffs' or Class Members' permission or knowledge, and in an

15   unencrypted form. Plaintiffs and Class Members were damaged by Defendants' unauthorized

16   use of the resources of Plaintiff's and Class Members' mobile devices including battery power,

17   cell phone memory, CPUs, and bandwidth.  Plaintiffs and Class Members had unauthorized

18   charges to their mobile devices for every hidden text message that was sent by Carrier IQ.

19

20        221.   As a direct and proximate result of Defendants' trespass to chattels, nuisance,

21   interference, unauthorized access of and intermeddling with Plaintiffs' and Class Members'

22   property, Defendants have injured and impaired Plaintiffs and Class Members in the condition

23   and value of Plaintiffs' Class Members' mobile devices, as follows:

24             (a)    By consuming the resources of and/or degrading the performance of

25   Plaintiffs' and Class Members' mobile devices (including space, memory, processing cycles,

26   Internet connectivity, and unauthorized use of their bandwidth);

27             (b)    By diminishing the use of, value, speed, capacity, and/or capabilities

28   of Plaintiffs' and Class Members' mobile devices;

             (c)    By devaluing, interfering with, and/or diminishing Plaintiffs' and

Class Members' possessory interest in their mobile devices;

        (d)     By altering and/or controlling the functioning of Plaintiffs' and Class Members' mobile devices;

        (e)     By infringing on Plaintiffs' and Class Members' right to exclude others from their mobile devices;

        (f)     By infringing on Plaintiffs' and Class Members' right to determine, as owners of/or their mobile devices, which programs should be installed and operating on their mobile devices;

        (g)     By compromising the integrity, security, and ownership of Class Members' mobile devices; and

        (h)     By utilizing Plaintiffs' and Class Members' mobile device resources without notice or consent.

### THIRTEENTH CAUSE OF ACTION

#### Unjust Enrichment

#### Against All Defendants

222.    Plaintiffs hereby incorporate by reference the allegations contained in all of the paragraphs of this complaint.

223.    By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits from the Plaintiffs and Class Members under circumstances that make it inequitable and unjust for Defendants to retain them.

224.    Plaintiffs and the Class have conferred a benefit upon the Defendants who have, directly or indirectly, received and retained the confidential information of Plaintiffs and Class Members as set forth herein. Defendants have received and retained information that is otherwise private, confidential, and not of public record, and/or have received revenue from the provision, use, and or trafficking in the sale of such information.

225.    Defendants appreciate and/or have knowledge of said benefit.

226.    Under principles of equity and good conscience, Defendants should not be permitted to retain the information and/or revenue that they acquired by virtue of their

unlawful conduct. All funds, revenue, and benefits received by them rightfully belong to Plaintiffs and the Class, which the Defendants have unjustly received as a result of their actions.

227.    Plaintiffs and Class Members have no adequate remedy at law.

228.    Defendants have received a benefit from Plaintiffs and Class Members and Defendants have received and retained money or other benefits from third parties as a result of sharing Plaintiffs' and Class Members' confidential information of Plaintiffs and Class Members without Plaintiffs' or Class Members' knowledge or consent as alleged in this Complaint.

229.    Plaintiffs and Class Members did not expect that Defendants would seek to gain commercial or business advantage from third parties by using their personal information without their knowledge or consent.

230.    Defendants knowingly used Plaintiffs' and Class Members' confidential information without their knowledge or consent to gain commercial advantage from third parties and had full knowledge of the benefits they have received from Plaintiffs and Class Members. If Plaintiffs and Class Members had known Defendants were not keeping their confidential information from third-parties, they would not have consented and Defendants would not have gained commercial or business advantage from third parties.

231.    Defendants will be unjustly enriched if Defendants are permitted to retain the money or other benefits paid to them by third parties, or resulting from the commercial or business advantage they gained, in exchange for Plaintiffs' and Class Members' confidential information.

232.    Defendants should be required to provide restitution of all money obtained from their unlawful conduct.

233.    Plaintiffs and the Members of the Class are entitled to an award of compensatory and punitive damages in an amount to be determined at trial or to be imposition of a constructive trust upon the wrongful revenues and/or profits obtained by and benefits conferred upon Defendants as a result of the wrongful actions as alleged in this complaint.

234.    Plaintiffs and the Class have no remedy at law to prevent Defendants from continuing the inequitable conduct alleged in this complaint and the continued unjust retention of the money and/or benefits Defendants received from third parties.

## FOURTEENTHCAUSE OF ACTION

### Conversion

### Against All Defendants

235.    Plaintiffs hereby incorporate by reference the allegations contained in all of the preceding paragraphs of this complaint.

236.    Plaintiffs' and Class Members' mobile device data, including but not limited to their incoming text messages, URLs of websites viewed and GPS coordinates, was viewed by Defendants and made available to third party software and applications with log file permission to collect confidential, unencrypted data about Plaintiffs' and Class Members' mobile device activities. Such property, owned by the Plaintiffs and Class Members, is valuable to the Plaintiffs and Class Members.

237.    Plaintiffs' and Class Members' mobile devices use battery power, cell phone memory, CPUs, and bandwidth. Defendants' activities, made the basis of this action, used without notice or authorization, such battery power, memory, CPU and bandwidth for purposes not contemplated and not agreed to by Plaintiffs and Class Members when they purchased their HTC mobile devices. Such property, owned by Plaintiffs and Class Members, is valuable to Plaintiffs and Class Members. Plaintiffs and Class Members were damaged by Defendants' unauthorized use of Plaintiff's and Class Members' battery power, cell phone memory and CPUs, as well as bandwidth. Moreover, Defendants utilized Plaintiffs' and Class Members' limited text messages in order to send secret and unauthorized instructions to their mobile devices. Plaintiffs and Class Members paid unauthorized charges for every hidden text message that was sent by Defendants.

238.    Defendants unlawfully exercised dominion over said property and thereby converted Plaintiffs' and Class Members' property.

239.    Plaintiffs and Class Members were damaged by Defendants' actions.

1

## PRAYER FOR RELIEF

2       WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated,

3  pray for judgment against Defendants as follows:

4       A.    Certify this case as a Class action on behalf of the Classes defined above,

5  appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

6       B.    Declare that the actions of Defendants, as set out above, violate the claims

7  alleged;

8       C.    Award injunctive and equitable relief including, *inter alia*: (i) prohibiting

9  Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all

10 of their ill-gotten gains to Plaintiffs and Class Members, or to whomever the Court deems

11 appropriate; (iii) requiring Defendants to delete all data surreptitiously or otherwise collected

12 data through the acts alleged above; (iv) requiring Defendants to provide Plaintiffs and Class

13 Members a means to easily and permanently decline any participation in any data collection

14 activities; (v) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully

15 acquired by Defendants by means of the wrongful conduct alleged herein; and (vi) ordering an

16 accounting and constructive trust imposed on the data, funds, or other assets obtained by

17 unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment

18 of such assets by Defendants;

19

20      D.    Award damages, including statutory damages where applicable, to Plaintiffs and

21 Class Members in an amount to be determined at trial;

22      E.    Award restitution against Defendants for all money to which Plaintiffs and the

23 Classes are entitled in equity;

24      F.    Restrain Defendants, their officers, agents, servants, employees, and attorneys,

25 and those in active concert or participation with them from continued access, collection, and

26 transmission of Plaintiffs' and Class Members' confidential user data via preliminary and

27 permanent injunction;

28      G.    Award Plaintiffs and the Classes:

         (i)        Compensatory damages sustained by Plaintiffs and all others

CLASS ACTION COMPLAINT
-53-

**JURY TRIAL DEMAND**

The Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated this 6th day of December, 2011.

By: _____

STRANGE & CARPENTER

Brain R. Strange (Cal. Bar. No. 103252)
LACounsel@earthlink.net
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210

Law Office of Joseph H. Malley
Joseph H. Malley (not admitted)
malleylaw@gmail.com
1045 North Zang Blvd
Dallas, TX 75208
Telephone: (214) 943-6100

*Counsel for Plaintiffs and the Proposed Class*